# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## OF

# Three Points Center, LLC

### A Colorado Limited Liability Company

### Effective as of August 12, 2021

**The securities offered hereby have not been registered or qualified under the Securities Act of 1933, as amended, or any state securities laws. Neither the United States Securities and Exchange Commission nor any state securities regulatory authority has approved or disapproved these securities, nor has any commission or authority passed upon or endorsed the merits of this offering or the accuracy or adequacy of any disclosure made in connection therewith. Any representation to the contrary is a criminal offense. The securities offered hereby may not be offered, pledged, assigned, resold or otherwise transferred unless registered or qualified under the Securities Act and applicable state securities laws or pursuant to an exemption therefrom and the Company receives an opinion of counsel satisfactory to the Board of Directors and its legal counsel that such sale, pledge, assignment or transfer is exempt from the registration requirements of the Securities Act and applicable state securities laws.**

DEFENDANTS' EXHIBIT D to DEFS. MOTION TO DISMISS AMENDED COMPLAINT

## TABLE OF CONTENTS

1. Organization. ...................................................................................................................1
   1.1. Formation ...........................................................................................................1
   1.2. Name and Place of Business.............................................................................1
   1.3. Business and Purpose of the Company .............................................................1
   1.4. Term ...................................................................................................................1
   1.5. Required Filings ................................................................................................1
   1.6. Registered Office and Registered Agent ..........................................................1
   1.7. Certain Transactions..........................................................................................2

2. Definitions ....................................................................................................................2

3. Capitalization and Financing .......................................................................................5
   3.1. Members' Capital Investments; Issuance of Units...........................................5
   3.2. Officer, Director and Member Loans ................................................................6
   3.3. Company Loans.................................................................................................6
   3.4. Additional Financing ........................................................................................6
   3.5. Warrants, Options and Similar Rights...............................................................7
   3.6. Reserves.............................................................................................................7

4. Allocation of Tax Items ...............................................................................................8
   4.1. Net Income and Net Loss Allocations..............................................................8
   4.2. Special Allocations...........................................................................................8
   4.3. Curative Allocations .........................................................................................9
   4.4. Contributed Property .........................................................................................9
   4.5. Allocation Among Units..................................................................................10
   4.6. Allocation of Company Items .........................................................................10
   4.7. Transferred Units.............................................................................................10
   4.8. Power of Board to Vary Allocations ...............................................................10
   4.9. Consent of Members........................................................................................11

5. Distributions ...............................................................................................................11
   5.1. General. ...........................................................................................................11
   5.2. Cash from Operations......................................................................................11

6. Rights, Authority and Voting of the Members ...........................................................11
   6.1. Members Are Not Agents................................................................................11
   6.2. Voting by a Member........................................................................................11
   6.3. Annual Meetings .............................................................................................12
   6.4. Special Meetings .............................................................................................12
   6.5. Majority Vote ..................................................................................................12
   6.6. Conduct of Meetings .......................................................................................12
   6.7. Rights of Members ..........................................................................................14
   6.8. Restrictions on Unit Holders ..........................................................................15

6.9.    Return of Distributions Paid to Unit Holder ................................................. 15

7.    Management ........................................................................................................... 15

    7.1.    Directors ........................................................................................................ 15
    7.2.    Number of Directors ...................................................................................... 15
    7.3.    Election and Term of Directors; Vacancies.................................................... 15
    7.4.    Resignation and Removal ............................................................................... 16
    7.5.    Status of Directors Under Act and Applicable Law ...................................... 16
    7.6.    Duty of Loyalty and Care .............................................................................. 16
    7.7.    Committees .................................................................................................... 16
    7.8.    Compensation of Directors; Expenses........................................................... 16
    7.9.    Meetings of Board of Directors ..................................................................... 16

8.    Officers .................................................................................................................. 18

    8.1.    Executive Officers ......................................................................................... 18
    8.2.    Powers and Duties .......................................................................................... 18
    8.3.    Tenure; Resignation; Removal; Vacancies ................................................... 18
    8.4.    Officers as Agents ......................................................................................... 18
    8.5.    Duty of Loyalty and Care .............................................................................. 18
    8.6.    Compensation of Officers and other Employees............................................ 18

9.    Company Expenses; Insurance .............................................................................. 19

    9.1.    Company Expenses ........................................................................................ 19
    9.2.    Insurance ........................................................................................................ 19

10.    Transfer of Units ................................................................................................... 19

    10.1.    Permitted Assignments .................................................................................. 19
    10.2.    Substituted Member........................................................................................ 20
    10.3.    Rights of Economic Interest Owner ............................................................... 21
    10.4.    Right to Inspect Books ................................................................................... 21
    10.5.    Assignment of 50% or More of Units ............................................................ 21
    10.6.    Transfer Subject to Law ................................................................................. 21
    10.7.    Termination of Membership Interest .............................................................. 21
    10.8.    Involuntary Dispositions ................................................................................ 21

11.    Books, Records, Accounting and Reports ............................................................. 22

    11.1.    Records, Audits and Reports .......................................................................... 22
    11.2.    Delivery to Unit Holders and Inspection........................................................ 22
    11.3.    Annual Report ................................................................................................ 23
    11.4.    Tax Information .............................................................................................. 23

12.    Termination and Dissolution of the Company ...................................................... 23

    12.1.    Termination of Company ............................................................................... 23
    12.2.    Statement of Dissolution ................................................................................ 24
    12.3.    Liquidation of Assets...................................................................................... 24
    12.4.    Distributions Upon Dissolution ..................................................................... 24

13.    Special and Limited Power of Attorney ................................................................ 24

13.1. Power of Attorney ...................................................................................24
13.2. Notice to Members ...................................................................................25

14. Death, Bankruptcy, Incapacity, Marital Dissolution of a Member or Termination of Employment of an Employee-Member .........................................................25

14.1. Death of a Member ..................................................................................25
14.2. Bankruptcy of a Member .........................................................................26
14.3. Insanity or Incapacity of a Member .........................................................26
14.4. Marital Dissolution of a Member ............................................................27

15. Amendment of Agreement .................................................................................28

15.1. Admission of Member ..............................................................................28
15.2. Amendments with Consent of the Members ............................................28
15.3. Amendments without Consent of the Members ......................................28
15.4. Execution and Recording of Amendments ..............................................29

16. Miscellaneous .....................................................................................................29

16.1. Counterparts ............................................................................................29
16.2. Successors and Assigns ...........................................................................29
16.3. Severability ..............................................................................................30
16.4. Notices .....................................................................................................30
16.5. Governing Law ........................................................................................30
16.6. Captions ...................................................................................................30
16.7. Number and Gender ................................................................................30
16.8. Additional Documents .............................................................................30
16.9. Disputes and Binding Arbitration ...........................................................30
16.10. Integrated and Binding Agreement .........................................................31
16.11. Not for Benefit of Creditors ....................................................................31
16.12. Legal Representation and Independent Counsel .....................................31
16.14. Reconstitution in Another State ..............................................................31
16.15. Title to Company Property ......................................................................32
16.16. Relationship of This Agreement to the Act ............................................32

Exhibit A – List of Members

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
# Three Points Center, LLC

This Amended and Restated Limited Liability Company Agreement of Three Points Center, LLC, is made and entered into effective as of August 12, 2021, by and among the Persons whose names are set forth as Members on Exhibit A (together with the parties who become Members of the Company in accordance with the provisions of this Agreement and whose names are added as Members on Exhibit A, each a "Member" and collectively the "Members"), and the members of the Board of Directors, as the managers of the Company, pursuant to the Act on the following terms and conditions. This Amended and Restated Limited Liability Company Agreement amends and restates in its entirety that Limited Liability Company Agreement, effective as of September 18th, 2013 ("Limited Liability Company Agreement), among Glenn Thibault, as attorney-in-fact for the Members, Glenn Thibault, as a Director, Dr. Norm Thibault, as a Director, and Bruce Kellogg, as a Director and any other amendments and supplements to the Limited Liability Company Agreement.

1. Organization.

    1.1. Formation. On March 11, 2013, the Certificate was filed in the office of the Secretary of State of Colorado in accordance with and pursuant to the Act.

    1.2. Name and Place of Business. The name of the Company shall be Three Points Center, LLC, and its principal place of business shall be 1068 Cypress Way, Castle Rock CO 80108. The Board may change such name, change such place of business or establish additional places of business of the Company as the Board may determine to be necessary or desirable.

    1.3. Business and Purpose of the Company. The Company's business and purpose shall consist of (i) the ownership, operation, management and financing thereof of a Residential Treatment Center for adopted troubled adolescents, which may include such businesses owned and operated through one or more wholly owned subsidiaries of the Company within or outside the United States; (ii) such activities as are necessary or incidental in connection therewith; and (iii) any or all other business or related activities approved by the Members in which limited liability companies may engage under the Act and other applicable law.

    1.4. Term. The term of the Company shall continue until terminated in accordance with subsequent provisions of this Agreement, or as otherwise provided by law.

    1.5. Required Filings. An authorized officer of the Company shall execute, acknowledge, file, record and/or publish such certificates and documents as may be required by this Agreement or by law in connection with the formation and operation of the Company.

    1.6. Registered Office and Registered Agent. The Company's registered office and registered agent shall be as provided in the Certificate. The Board may from time to time change the registered office and registered agent by causing the address of the new registered office and/or the name of the new registered agent to be filed pursuant to the Act.

1.7.  Certain Transactions.  Any Director, Member, Economic Interest Owner or any Affiliate, or any shareholder, officer, director, employee, partner, manager, member or any Person owning an interest therein, may engage in or possess an interest in any other business or venture of any nature or description, whether or not competitive with the Company, and no Director, Member, Economic Interest Owner or other Person shall have any interest in such other business or venture by reason of their interest in the Company.

2.  Definitions.  Unless otherwise provided herein or unless the context otherwise requires, certain terms in this Agreement shall be defined according to the definitions set forth below. These definitions, however, are provided as a matter of convenience and for reference. In the event of any conflict between these definitions and the provisions of other sections of this Agreement, such other sections shall prevail.

"Act" shall mean the Colorado Limited Liability Company Act, as the same may be amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts that the Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to applicable provisions of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

"Adjusted Capital Investment" shall refer to the actual cash or agreed upon value of property or services contributed by a Member, plus any additional capital contributions by such Member, plus one hundred percent (100%) of all taxable income allocated to such Member, less Distributions to such Member and to any successor in interest. If any Person transfers all or a portion of its interest in the Company in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Investment of the transferor to the extent that it relates to the transferred interest.

"Affiliate" shall mean (i) any Person directly or indirectly controlling, controlled by or under common control with another Person; (ii) a Person owning or controlling 10% or more of the outstanding voting securities of such other Person; (iii) any officer, director, partner, manager, trustee or anyone acting in a substantially similar capacity of such other Person; and (iv) if such other Person is an officer, director, partner or manager, any company for which such Person acts in any capacity.

"Agreement" shall mean this Amended and Restated Limited Liability Company Agreement of Three Points Center, LLC, as further amended from time to time.

"Board" or "Board of Directors" shall mean the Board of Directors of the Company, as constituted from time to time.

"Capital Account" shall mean the Capital Account that shall be established, maintained and adjusted for each Member in accordance with applicable rules of the Treasury Regulations. Increases and decreases in the Capital Accounts of Members shall be made at the sole and

absolute discretion of the Board and in accordance with applicable Treasury Regulations. The foregoing provisions and any other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Treasury Regulations. To the extent any provision of this Agreement is inconsistent with such Treasury Regulations, such Treasury Regulations (as the same may be amended or revised hereafter) shall control. If the Board shall determine that it is prudent to modify the manner in which Capital Accounts, or any debits or credits thereto, are computed or maintained in order to comply with such Treasury Regulations, the Board is authorized to make such modifications. Any references in this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be debited or credited from time to time as set forth above. The Capital Account of a Substituted Member shall include the Capital Account of his, her or its transferor. References in this Agreement to the Treasury Regulations shall include corresponding subsequent provisions.

"Cash from Operations" shall mean the net cash realized by the Company from all sources, including, but not limited to, the operations of the Company and/or its subsidiaries, if any, after payment of all cash expenditures of the Company, including, but not limited to, all operating expenses, including all fees, reimbursements and compensation due to employees, officers and Directors of the Company, including any bonuses or other compensation payable under any bonus or other compensation plan approved by the Board, all payments of principal and interest on any indebtedness of the Company, expenses for repairs and maintenance, capital improvements and replacements on any Property, and such reserves as the Board determines in its sole discretion to be necessary and desirable in connection with the Company's operations and with its then existing assets and any anticipated acquisitions, development projects, financings or operations.

"Certificate" shall mean the Articles of Organization of the Company as filed with the Secretary of State of Colorado, as the same may be amended from time to time.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequently enacted federal revenue laws.

"Company" shall refer to Three Points Center, LLC, a Colorado limited liability company.

"Company Minimum Gain" shall mean "partnership minimum gain" as set forth in applicable provisions of the Treasury Regulations.

"Director(s)" shall mean, at any time, the Persons then serving on the Board of Directors of the Company, in accordance with this Agreement. Reference to a Director shall be to any one of the Directors.

"Distribution(s)" shall refer to any money or other property transferred without consideration to Members or Unit Holders with respect to their interests or Units in the Company.

"Economic Interest" shall mean an interest in the Net Income, Net Loss and Distributions of the Company but shall not include any right to vote or to participate in the management of the Company.

"Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

"Majority Vote" shall mean the vote and/or approval of Members who own more than 50% of the Units entitled to vote. Members shall be entitled to cast one vote for each Unit they own. Units repurchased by and held by the Company shall not be entitled to vote on any matter.

"Member(s)" shall refer to the Persons who have been admitted to the Company as Members in accordance with the provisions of this Agreement. Reference to a Member shall be to any one of the Members.

"Member Minimum Gain" shall mean "partner nonrecourse debt minimum gain" as determined under applicable provisions of the Treasury Regulations.

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt" as set forth in applicable provisions of the Treasury Regulations.

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions," and the amount thereof shall be, as set forth in applicable provisions of the Treasury Regulations.

"Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and such voting and other rights and privileges that the Member may enjoy by being a Member.

"Net Income" shall mean the excess of: (a) those items of income and gain identified in Treasury Regulations Section 1.704-1(b)(2)(iv) that increase a Member's Capital Account under that section over (b) those items of deduction and loss identified in Treasury Regulations Section 1.704-1(b)(2)(iv), other than Nonrecourse Deductions that decrease a Member's Capital Account under that section.

"Net Loss" shall mean the excess of: (a) those items of deduction or loss identified in Treasury Regulations Section 1.704-1(b)(2)(iv) that decrease a Member's Capital Account under that section, other than Nonrecourse Deductions, over (b) those items of income and gain identified in Treasury Regulations Section 1.704-1(b)(2)(iv) that would increase a Member's Capital Account under that section.

"Nonrecourse Debt" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"Nonrecourse Deductions" shall have the meaning, and the amount thereof shall be, as set forth in Treasury Regulations Section 1.704-2(c).

"Original Capital Investment" with respect to an individual Member, a group of Members, or all of the Members shall refer to gross proceeds to the Company from the sale of

Units to such Member or Members, or the agreed upon value of property or services contributed by a Member, and any subsequent capital contributions made by or agreed to be contributed by such Member at the time of the Member's original purchase of the Units. Original Capital Investment shall not include amounts paid to any Person with respect to any assignment of Units or any interest therein or to any substitution of a Member.

"Person(s)" shall mean any individual, partnership, corporation, trust, estate, limited liability company, unincorporated association or other legal entity.

"Property" shall refer to any or all of such real and tangible or intangible personal property or properties as may be acquired by the Company.

"Regulatory Allocations" shall mean the allocations in Section 4.2.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Substituted Member" shall mean any Person admitted as a substituted Member pursuant to this Agreement.

"Treasury Regulations" means regulations promulgated under the Code, as such regulations may be amended and in effect from time to time, or any corresponding provisions of subsequently enacted regulations.

"Unit" shall represent an interest in the Company entitling the owner of the Unit, if admitted as a Member, to the respective voting and other rights afforded to a Member holding a Unit, and affording to such Member a share in Net Income, Net Loss and Distributions as provided for in this Agreement.

"Unit Holder" shall mean a Member or the holder of an Economic Interest.

3.    Capitalization and Financing.

    3.1.    Members' Capital Investments; Issuance of Units.

        3.1.1.    Units.    Subject to Sections 3.4 and 3.5, the Company is hereby authorized to sell and issue Units in such amounts, at such times, to such Persons and on such terms and conditions as the Board shall determine in its sole and absolute discretion, and to admit the persons who acquire such Units as Members. The Company will not sell twenty-five percent (25%) or more of the Units to qualified benefit plans. The Company may not issue fractional Units.

        3.1.2.    Directors and Officers as Members.    Any Director or officer of the Company may purchase Units on such terms as are approved by the Board. As a result, Directors and officers may be admitted to the Company as Members with respect to such Units and would be entitled to all rights as Members appurtenant thereto, including, but not limited to, the right to allocations of Net Income and Net Loss and to receive Distributions attributable to the Units so purchased and to vote on certain Company matters as provided for in this Agreement.

3.1.3.    Admission of a Member.  To the extent required by law, the Board shall cause this Agreement to be amended and shall take such other action, as the Board deems necessary or appropriate, promptly after receipt and acceptance of a Member's Original Capital Investment to reflect the admission of such person to the Company as a Member. Except as otherwise provided in this Agreement, no Unit Holder shall have the right to receive the return of any Original Capital Investment and no interest shall be paid with respect to any Original Capital Investment.

3.1.4.    Liabilities of Members.  Except as specifically provided in this Agreement or the Act, neither the Directors nor any Member shall be required to make any additional contributions to the Company and no Director or Member shall be liable for the debts, liabilities, contracts, or any other obligations of the Company, nor shall the Directors or the Members be required to lend any funds to the Company or to repay to the Company, any Member, or any creditor of the Company any portion or all of any Adjusted Capital Account Deficit.

3.1.5.    No Certificates. No certificates representing Units will be issued unless otherwise determined in the Board's sole discretion.

3.2.    Officer, Director and Member Loans.  The officers, Directors, Members or their Affiliates may, but will have no obligation to, make loans to the Company to pay Company operating expenses. Any such loan shall bear interest at the actual cost of funds to the party making such loan, but in no event greater than the highest rate allowed by law, and provide for the payment of principal and any accrued but unpaid interest in accordance with the terms of the promissory note evidencing such loan, but in no event later than the termination and dissolution of the Company or the termination or removal from office of the party making such loan.

3.3.    Company Loans.  The Company may obtain loans or other debt financing to fund the Company's operations or otherwise as deemed necessary or desirable in the sole and absolute discretion of the Board from one or more lenders. Any such loans or financing shall be on such terms as the Board shall determine in its sole and absolute discretion, which may include without limitation the issuance of Units and/or warrants, options or other rights to acquire Units to any such lender, and which may or may not be secured by the Property. Each Unit Holder shall be required to, and hereby represents and warrants it shall cooperate in all reasonable respects with any request made by the Board, or a lender who is considering a loan or other financing. This cooperation shall include without limitation the obligation to execute all documents (other than recourse documents) and provide all information that is requested of the Unit Holder, and which are reasonably desirable for the purposes of the lender or the Board in connection with such financing efforts. All parties to this Agreement hereby consent in advance to any loans or other debt financing obtained in accordance with this Section 3.3.

3.4.    Additional Financing.

3.4.1.    The Board may determine, at any time and from time to time in its sole discretion, to pursue additional financing for the Company from sources it deems appropriate, including but not limited to the issuance and sale of debt securities or additional Units or classes

of Units in one or more offerings or transactions, on such terms and conditions as the Board, in its sole discretion, shall deem necessary or desirable.

3.4.2. Any new Units or classes of Units authorized by the Board for an additional financing described in Section 3.4.1 shall immediately become available for acquisition at such purchase prices and other terms of sale as shall reasonably be fixed by the Board, and each Member shall be given written notice of such declaration and of the terms of such sale. The purchase price of each additional Unit shall generally not be less than the then value of an existing Unit based on an existing Unit's interest in the Company, unless the additional Units to be offered represent a different class of Units with such terms and conditions as the Board reasonably determines would justify a lower price. Such valuation shall be performed by the Board and such valuation shall be conclusive and final.

3.4.3. The Directors or their Affiliates may purchase all or a portion of the additional Units and/or the Directors may offer and sell all or a portion of such Units on the terms set forth in this Section 3.4 to any Person of their selection.

3.4.4. All the parties to this Agreement hereby consent in advance to the addition as additional Members of any Person that, at any time in the future, may acquire Units in the manner prescribed in this Section 3.4. The Board shall conduct the sale of any such Units to any such parties in any manner as the Board, with the advice of the Company's legal counsel, shall consider appropriate in the circumstances.

3.5. <u>Warrants, Options and Similar Rights</u>. The Company may, upon the approval of the Board in its sole and absolute discretion, issue warrants, options and similar rights to acquire Units, which may include the issuance of restricted Units, to Directors, officers, other employees and consultants of the Company on such terms and conditions and for such purposes as the Board may determine, which may include for the purpose of providing incentive or other compensation. The total number of Units underlying warrants, options or similar rights issued pursuant to this Section 3.5 shall not, in the aggregate, exceed twenty percent (20%) of the outstanding Units on a fully diluted basis (not including Units repurchased and held by the Company) at the time of issuance of such warrant, option or right, nor may the Company issue warrants, options or similar rights to acquire, in the aggregate, more than ten percent (10%) of the outstanding Units on a fully diluted basis (not including Units repurchased and held by the Company) as of the time of issuance of such warrant, option or right during any calendar year.

3.6. <u>Reserves</u>. The Board may establish reserves in such amount as the Board determines in its sole discretion to be necessary and desirable in connection with the Company's operations. The amount held in reserves, if any, may be used by the Board in its sole discretion for any Company purpose including, but not limited to, the payment of Distributions. The Board may in its discretion invest funds held in reserve in cash equivalents including, but not limited to, certificates of deposit, commercial paper, treasury bills, money market accounts and other high quality, short-term investments that may easily be converted into cash. Any income earned thereon need not be retained in reserves but may be added to the general funds of the Company and used and/or distributed according to this Agreement.

4. Allocation of Tax Items.

4.1. Net Income and Net Loss Allocations. For each fiscal year, after giving effect to the allocations set forth in Sections 4.2 and 4.3, Net Income and Net Loss shall be allocated as follows. Net Income will be allocated to Members in proportion to the Distributions previously made or which are reasonably expected to be made after the end of the taxable year and with respect to which Net Income has not previously been allocated. If no Distributions have been made or are expected to be made, Net Income will be allocated to the Members in the ratio their Capital Account bears to the sum of the Capital Accounts of all Members. Net Loss will be allocated to the Members in the ratio their Capital Account bears to the sum of the Capital Accounts of all Members.

4.2. Special Allocations. The following overriding special allocation rules shall apply notwithstanding anything to the contrary in this Section 4.

4.2.1. Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2.1 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2.1 were not in this Agreement.

4.2.2. Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2.2 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section 4 have been made as if this Section 4.2.2 were not in this Agreement.

4.2.3. Company Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Section 4, if there is a net decrease in Company Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-

{Z0363288/2 } Rev A 8-12-21

2(j)(2). This Section 4.2.3 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

4.2.4.    Member Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Section 4, if there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain (as determined under Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This section shall not apply to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Debt due to conversion, refinancing or other change in a debt instrument that causes it to be partially or wholly a Nonrecourse Debt. This section is intended to comply with partner minimum gain chargeback requirements in the Treasury Regulations and shall be interpreted consistently therewith and applied with the restrictions attributable thereto.

4.2.5.    Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in proportion to their Units, and each Member's share of excess Nonrecourse Debt shall be in the same proportion.

4.2.6.    Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss as set forth in Treasury Regulations Section 1.752-2 with respect to the Member Nonrecourse Debt. If more than one Member bears the economic risk of loss for a Member Nonrecourse Debt, any Member Nonrecourse Deductions attributable to that Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the economic risk of loss.

4.2.7.    Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Treasury Regulations.

4.3.    Curative Allocations. Notwithstanding any other provision of this Agreement, the Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

4.4.    Contributed Property. Notwithstanding any other provision of this Agreement, the Members shall cause depreciation and or cost recovery deductions and gain or loss attributable to

Property contributed by a Member or revalued by the Company to be allocated among the Members for income tax purposes in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder.

4.5. <u>Allocation Among Units</u>. Except as otherwise provided in this Agreement, all Distributions and allocations made to the Units shall be in the ratio of the number of Units held by each such Member on the date of such allocation (which allocation date shall be deemed to be the last day of each month) to the total outstanding Units as of such date (not including Units repurchased and held by the Company), and, except as otherwise provided in this Agreement, without regard to the number of days during such month that the Units were held by each Member. Members who purchase Units at different times during the Company tax year shall be allocated Net Income and Net Loss using any conventions permitted by law and selected by the Board. For purposes of this Section 4, an Economic Interest Holder shall be treated as a Member.

4.6. <u>Allocation of Company Items</u>. Except as otherwise provided herein, whenever a proportionate part of Net Income or Net Loss is allocated to a Member, every item of income, gain, loss or deduction entering into the computation of such Net Income or Net Loss, and every item of credit or tax preference related to such allocation and applicable to the period during which such Net Income or Net Loss was realized shall be allocated to the Unit Holder in the same proportion.

4.7. <u>Transferred Units</u>. If any Unit or any portion thereof is transferred during any period, the Net Income and Net Loss and all other items attributable to such Unit or portion thereof for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Board, in its sole discretion. Solely for purposes of making such allocations, the Company shall recognize the transfer of such Unit or portion thereof not later than the end of the calendar month during which it receives adequate notice of such transfer, provided that if the Company does not receive adequate notice stating the date such Unit or portion thereof was transferred and such other information as the Board may reasonably require within thirty days after the end of the period during which the transfer occurs, then all of such items shall be allocated to the person who, according to the books and records of the Company on the last day of the period during which the transfer occurs, was the owner of the Unit or portion thereof. All Distributions shall be made to the holder of record as reflected on the Company's books on the record date for such Distributions in accordance with this Agreement. Neither the Board nor the Company shall incur liability for making allocations and Distributions in accordance with the provisions of this Section 4.7, whether or not the Board or the Company has knowledge of any transfer of ownership of any Unit or portion thereof.

4.8. <u>Power of Board to Vary Allocations</u>. It is the intent of the Members that each Member's share of Net Income and Net Loss be determined and allocated in accordance with Section 704(b) and Section 514(c)(9) of the Code and the provisions of this Agreement shall be so interpreted. Therefore, if the Board is advised by the Company's legal counsel that the allocations provided in this Section 4 are unlikely to be respected for federal income tax purposes, the Board is hereby granted the power to amend the allocation provisions of this Agreement to the minimum extent necessary to comply with Section 704(b) and Section

514(c)(9) of the Code and effect the plan of allocations and distributions provided for in this Agreement.

4.9.   Consent of Members.   The allocation methods of Net Income and Net Loss are hereby expressly consented to by each Member as a condition of becoming a Member.

5.   Distributions.

5.1.   General. The Board, in its sole discretion, shall determine when Cash from Operations shall be distributed to Members. All Distributions shall be subject to maintaining the Company in a sound financial and cash position, including the establishment of such reserves as the Board determines in its sole discretion to be necessary and/or desirable in connection with the Company's then current or anticipated operations. When, in the sole discretion of the Board, the business of the Company no longer requires the maintenance of reserves, any remaining reserves may be distributed pursuant to this Agreement. The Company initially intends to retain Cash from Operations to fund the development and growth of its business and to pay down any outstanding debt acquired by the Company in connection with the acquisition of the Company's business. In the event any Members have provided personal guarantees on any Company debt, no distributions to Members may be made while any such guarantees are in effect without the consent of the Members who have provided any such personal guarantees.

5.2.   Cash from Operations.   Except as otherwise provided herein, Cash from Operations, to the extent determined by the Board to be available for Distribution to Members, shall be distributed to the Members in proportion to their Units.

6.   Rights, Authority and Voting of the Members.

6.1.   Members Are Not Agents.   Pursuant to Section 7, the management of the Company is vested in the Board of Directors.   No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

6.2.   Voting by a Member.   Members shall be entitled to cast one vote for each Unit they own.   Except as otherwise specifically provided in this Agreement, Members (but not Economic Interest Owners) shall have the right to vote only upon the following matters:

6.2.1.   The election and removal of Directors as provided in this Agreement;

6.2.2.   Except as otherwise provided herein, any material amendment of this Agreement;

6.2.3.   Any merger or combination of the Company or roll-up of the Company;

6.2.4.   Termination, dissolution, liquidation and winding up of the Company as set forth in Section 12;

6.2.5.   The conversion of the Company from a limited liability company to a corporation; and

6.2.6.   The sale of all or substantially all of the assets of the Company.

6.3.   Annual Meetings. A meeting of the Members shall be held annually at a time specified by the Board, at which meeting the Members shall elect the Board of Directors and transact such other business as may properly be brought before the meeting

6.4.   Special Meetings. Special meetings of the Members, for any purpose, unless otherwise prescribed by statute, may be called by the Board, or by any two executive officers, or by any two Directors, or by the holders of greater than 20% of the outstanding Units. Any such request shall state the purposes of the proposed meeting.

6.5.   Majority Vote.   Matters upon which the Members may vote shall require a Majority Vote except as otherwise herein set forth or required by the Act. The Board shall promptly implement any action approved by the Members pursuant to Section 6.2 and shall take such actions as are necessary to reasonably effectuate all decisions made by the Members pursuant to Section 6.2 or otherwise herein.

6.6.   Conduct of Meetings.

6.6.1.   Notice.  Written notice of each meeting shall be given to each Member entitled to vote.  All such notices shall be sent not less than ten (10), nor more than sixty (60), days before such meeting.  The notice shall specify the place, date and hour of the meeting and the general nature of business to be transacted, and no other business shall be transacted at the meeting. If the Board shall fail to send a notice of a meeting within twenty (20) days of receiving a request by a Member entitled to call a meeting pursuant to Section 6.4 herein, the Member having made the written request therefore shall have the right to establish the time and place of a meeting, and to send a written notice thereof otherwise in accordance with the provisions of this Section 6.6.1 to all Members entitled to vote. All expenses of voting and notification shall be borne by the Company.

6.6.2.   Adjourned Meeting and Notice Thereof.  When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Company may transact any business that might have been transacted at the original meeting.  If the adjournment is for more than forty-five (45) days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

6.6.3.   Quorum.  The presence in person or by proxy of the persons entitled to vote a majority of the Units shall constitute a quorum for the transaction of business.  The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a Majority Vote or such greater vote as may be required by this Agreement or by law.  In the absence of a quorum, any meeting of Members may be adjourned from time to time by the vote

of a majority of the Units represented either in person or by proxy, but no other business may be transacted, except as provided above.

6.6.4.   Consent of Absentees.  The transactions of any meeting of Members, however called and noticed and wherever held, are as valid as though they occurred at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signs a written waiver of notice, or a consent to holding of the meeting or an approval of the minutes thereof.  All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance at a meeting shall constitute a waiver of notice of the meeting except when the Person objects, at the beginning of the meeting, to the transaction of any business because the meeting was not lawfully called or convened and except that attendance at a meeting is not a waiver of any right to object to the consideration of a matter required to be included in the notice but not so included, if the objection is expressly made at the meeting.

6.6.5.   Action Without Meeting.   Except as otherwise provided in this Agreement, any action which may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all entitled to vote thereon were present and voted.  In the event the Members are requested to consent on a matter without a meeting, each Member shall be given not less than ten (10), nor more than sixty (60), days notice.

6.6.6.   Record Dates.  For purposes of determining the Members entitled to notice of any meeting or to vote or entitled to receive any Distributions or to exercise any rights in respect of any other lawful matter, the Board may fix in advance a record date, which is not more than sixty (60) nor less than ten (10) days prior to the date of the meeting nor more than sixty (60) days prior to any other action. If no record date is fixed:

(a)   The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held;

(b)   The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given;

(c)   The record date for determining Members for any other purpose shall be at the close of business on the day on which the Board adopts it, or the sixtieth (60th) day before the date of the other action, whichever is later; and

(d)   A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Board, or the Members who requested the meeting fix a new record date for the adjourned meeting, but the

Board, or such Members, shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

6.6.7.    Voting; Proxies.  A Member shall be entitled to cast one vote for each Unit owned by such Member. Every person entitled to vote or execute consents shall have the right to do so either in person or by one or more agents authorized by a written proxy executed by such person or his or her duly authorized agent and filed with the Board.  No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy.  Every proxy continues in full force and effect until revoked as specified or unless it states that it is irrevocable.  A proxy that states that it is irrevocable is irrevocable for the period specified therein or, if no period of irrevocability is stated therein, then for the period of the validity of the proxy.

6.6.8.    Chairman of Meeting.  The Board may select any person to preside as Chairman of any meeting of the Members, and if such person shall be absent from the meeting, or fail to be able to preside, the Board may name any other person in substitution therefore as Chairman. The Chairman of the meeting shall designate a secretary for such meeting, who shall take and keep or cause to be taken and kept minutes of the proceedings thereof.  The conduct of all Members' meetings shall at all times be within the discretion of the Chairman of the meeting and shall be conducted under such rules as the Chairman may prescribe.  The Chairman shall have the right and power to adjourn any meeting at any time, without a vote of the Units present in person or represented by proxy, if the Chairman shall determine such action to be in the best interests of the Company.

6.6.9.    Inspectors of Election.  In advance of any meeting of Members, the Board may appoint any persons other than nominees for the Board or other office as the inspector of election to act at the meeting and any adjournment thereof.  If an inspector of election is not so appointed, or if any such person fails to appear or refuses to act, the Chairman of any such meeting may, and on the request of any Member or such Member's proxy shall, make such appointment at the meeting.  The inspector of election shall determine the number of Units outstanding and the voting power of each, the Units represented at the meeting, the existence of a quorum, the authenticity, validity and effect of proxies, receive votes, ballots or consents, hear and determine all challenges and questions in any way arising in connection with the right to vote, count and tabulate all votes or consents, determine when the polls shall close, determine the result and do such acts as may be proper to conduct the election or vote with fairness to all Members.

6.6.10.    Record Date and Closing Company Books.  When a record date is fixed, only Members of record on that date are entitled to notice of and to vote at the meeting or to receive Distributions, or allotments of rights, or to exercise the rights, as the case may be, notwithstanding any transfer of any Units on the books of the Company after the record date.

6.7.    Rights of Members.  No Unit Holder shall have the right or power to: (i) cause the dissolution and winding up of the Company by court decree or otherwise, except as set forth in this Agreement; (ii) withdraw or reduce its contribution to the capital of the Company, except as a result of the dissolution and termination of the Company or as otherwise provided in this Agreement or by law; or (iii)   demand or receive property other than cash in return for its

Original Capital Investment. Except as provided in this Agreement, no Unit Holder shall have priority over any other Unit Holder either as to the return of capital contributions or as to allocations of the Net Income, Net Loss or Distributions of the Company. Other than upon the termination and dissolution of the Company as provided by this Agreement, there has been no time agreed upon when the contribution of each Unit Holder is to be returned. Notwithstanding the foregoing, the Company may repurchase Units held by any one or more Unit Holders on such terms and conditions as are approved by the Board in its sole and absolute discretion and, in connection with any such repurchase, shall not be required to offer to repurchase the Units of any other Unit Holder on the same or different terms.

6.8. <u>Restrictions on Unit Holders</u>. No Unit Holder shall:

6.8.1. Disclose to any non-Unit Holder other than its respective lawyers, accountants or consultants and/or commercially exploit any of the Company's business practices, trade secrets or any other intellectual property, any proprietary or confidential information, or any other information not generally known to Persons other than Unit Holders;

6.8.2. Do any other act or deed with the intention of harming the business operations of the Company; or

6.8.3. Do any act contrary to this Agreement.

6.9. <u>Return of Distributions Paid to Unit Holder</u>. In accordance with the Act, a Unit Holder may, under certain circumstances, be required to return to the Company, for the benefit of the Company's creditors, amounts previously distributed to the Unit Holder. If any court of competent jurisdiction holds that any Unit Holder is obligated to make any such payment, and such holding is not subject to appeal or further appeal or reconsideration, such obligation shall be the obligation of such Unit Holder and not of the Company, the Board or any other Unit Holder.

7. <u>Management</u>.

7.1. <u>Directors</u>. The property and business of the Company shall be managed by its Board, which may exercise all such powers of the Company and do all such lawful acts and things on its behalf as are not, by statute, the Certificate or this Agreement, directed or required to be exercised or done by the Members. Directors need not be Members.

7.2. <u>Number of Directors</u>. The authorized number of Directors on the Board shall not be less than three nor more than seven unless changed by a duly adopted amendment to this Agreement. The exact number of Directors comprising the Board may be changed from time to time by the Board within the limits specified by the preceding sentence provided that a reduction in the number of Directors comprising the Board does not have the effect of removing a Director from office prior to the expiration of such Director's term.

7.3. <u>Election and Term of Directors; Vacancies</u>. Directors shall be elected annually or at such other times as may be determined by the Members, by election at the annual meeting or by written consent of the Members in lieu of such meeting. Each Director shall hold office until a successor is elected and qualified or until such Director's earlier death, resignation, expulsion or removal. The Board shall, as soon as reasonably practicable, fill any vacancy in the Board

occurring for any reason, including death, resignation or disqualification, removal for cause or without cause, an increase in the number of Directors, or otherwise.

7.4.     Resignation and Removal.  Any Director may resign at any time by written notice to the Company and, unless otherwise restricted by law, the Members may remove any Director, for cause or without cause.

7.5.     Status of Directors Under Act and Applicable Law.  Each Director is hereby designated as a "manager" of the Company within the meaning of Section 7-80-102 of the Act. Notwithstanding the provisions of Section 7-80-405(1)(b) of the Act, except as provided in this Agreement or in a resolution of the Board, a Director may not bind the Company.

7.6.     Duty of Loyalty and Care.  Except as otherwise provided herein, each Director shall have a fiduciary duty of loyalty and care similar to that of a director of a business corporation organized under the Colorado Business Corporation Act

7.7.     Committees.  The Board may designate from among its members committees that may exercise any of the powers of the Board to the extent the Board so provides.  The Board from time to time may also designate advisory committees comprised of non-Directors to advise the Board on such matters as the Board deems advisable.

7.8.     Compensation of Directors; Expenses.  The Board shall have the authority to fix the compensation of Directors.  The Directors may be paid their expenses, if any, of attendance at meetings of the Board, which may be a fixed sum for attendance at each meeting of the Board or a stated salary as Director.  No such payment shall preclude any Director from serving the Company in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

7.9.     Meetings of Board of Directors.

(a)     Regular and Special Meetings of the Board.  The Board may hold meetings, both regular and special, within or outside the State of Colorado.  Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.  Special meetings of the Board may be called by the Chief Executive Officer on not less than one day's notice to each Director by telephone, facsimile, mail, telegram or any other means of communication, and special meetings shall be called by the Chief Executive Officer in like manner and with like notice upon the written request of any one or more of the Directors.

(b)     Quorum.  At all meetings of the Board, a majority of the Directors shall constitute a quorum for the transaction of business and, except as otherwise provided in any other provision of this Agreement, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board.  If a quorum shall not be present at any meeting of the Board, the Directors present at such meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(c)     Electronic Communications.  Members of the Board, or any committee designated by the Board, may participate in meetings of the Board, or any committee,

by means of telephone conference or similar communications equipment that allows all Persons participating in the meeting to hear each other, and such participation in a meeting shall constitute presence in Person at the meeting. If all the participants are participating by telephone conference or similar communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

(d)     Director Consent in Lieu of Meetings.  Any action of the Board or any committee thereof required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all of the members of the Board or committee, as the case may be, consent thereto in writing and such writing or writings are filed with the minutes of the proceedings of the Board or committee.

7.10.  Indemnification of Directors.

7.10.1.     No Director shall have any liability to the Company or to any Member for any loss suffered by the Company or any Member that arises out of any action or inaction of the Board if the Board, in good faith, determined that such course of conduct was in the best interests of the Company and such course of conduct did not constitute: (i) gross negligence, willful misconduct or fraud on the part of the Board; (ii) a breach of the Board's fiduciary duties to the Members; or (iii) a material and intentional breach of this Agreement. Moreover, no member of the Board shall be liable to the Company or the Members because any taxing authorities disallow or adjust any deductions or credits in the Company income tax returns.

7.10.2.     Each Director shall be indemnified and held harmless by the Company (to the extent of the Company's assets) against any losses, judgments, liabilities, expenses (including reasonable attorneys' fees) and amounts paid in settlement of any claims sustained by such Director in connection with the Company, provided that the Director, in good faith, determined that such course of conduct was in the best interests of the Company and the same was not the result of (i) gross negligence, willful misconduct or fraud on the part of the Director; (ii) a material breach of the Director's fiduciary duties to the Members; or (iii) a material and intentional breach of this Agreement.

7.10.3.     Notwithstanding the above, the Company shall not indemnify any Director for liabilities arising under federal or state securities laws unless (i) there has been a successful adjudication on the merits of each count involving securities law violations, or (ii) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction, and provided that a court either approves any settlement and finds that indemnification of the settlement and related costs should be made or approves indemnification of litigation costs if a successful defense is made, which court shall have been advised as to the current position of the United States Securities and Exchange Commission (as to any claim involving allegations of violation of the Securities Act) or the applicable state authority (as to any claim involving allegations that the applicable state's securities laws were violated), and, in this regard, a dismissal with prejudice on the merits is considered a successful defense; or (iii) in the opinion of counsel for the Company, the right to indemnification has been settled by controlling precedent. The Company shall not indemnify any other Person except as set forth herein for liabilities arising under any federal or state securities law.

7.11. <u>Tax Matters Representative</u>. The Members shall appoint a qualified representative to act as the tax matters representative.

8.  <u>Officers</u>.

8.1.  <u>Executive Officers</u>.  The executive officers of the Company shall be a Chief Executive Officer, a President, a Chief Financial Officer, one or more Vice Presidents, a Secretary and such other officers as the Board may from time to time appoint. Any number of offices may be held by the same person, unless otherwise prohibited by law or this Agreement. The executive officers of the Company shall exercise such powers and perform such duties as are set forth herein and such additional powers and duties as the Board may at any time or from time to time determine to be advisable, and shall be chosen annually by the Board at its first meeting following the meeting of Members at which the Board was elected.

8.2.  <u>Powers and Duties</u>. The officers of the Company shall have such powers and duties in the management of the Company as may be prescribed in a resolution by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board. The Chief Executive Officer of the Company, subject to the direction of the Board, shall have general charge of the business and affairs of the Company, shall have direction over all other officers, agents and employees and may assign such duties to such other officers of the Company as he or she deems appropriate.

8.3.  <u>Tenure; Resignation; Removal; Vacancies</u>. Each officer of the Company shall hold office until such officer's successor is elected or appointed or until such officer's earlier displacement from office by resignation, removal or otherwise; provided, that if the term of office of any officer elected or appointed pursuant to this Agreement shall have been fixed by the Board, such officer shall cease to hold such office no later than the date of expiration of such term, regardless of whether any other person shall have been elected or appointed to succeed such officer. Any officer may resign by written notice to the Company and may be removed for cause or without cause by the Board, provided that any such removal shall be without prejudice to the rights, if any, of the officer so removed under any employment contract or other agreement with the Company. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board.

8.4.  <u>Officers as Agents</u>. The officers of the Company, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with the terms hereof shall bind the Company.

8.5.  <u>Duty of Loyalty and Care</u>. Each officer of the Company shall have a fiduciary duty of loyalty and care similar to that of an officer of a business corporation organized under the Colorado Business Corporation Act.

8.6.  <u>Compensation of Officers and other Employees</u>.  In addition to the provisions of Section 3.5, the Board shall have the authority to fix the compensation and benefits of the officers from time to time, and may, in its discretion, adopt equity, bonus or similar

compensation plans in which the officers and/or other employees of the Company may participate. Nothing herein shall preclude any officer or other employee from serving the Company or any subsidiary of the Company in any other capacity, including as a director, and receiving compensation therefore.

9. Company Expenses; Insurance.

9.1. Company Expenses. The Company may pay directly, or reimburse Directors, officers or Members, as the case may be, for all of the costs and expenses of the Company's operations, including, without limitation, any and all expenses advanced or to be advanced by Directors, officers, Members or others.

9.2. Insurance. The Board may, but is not required to, buy and maintain insurance on behalf of any person who is or was a Director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another company, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Company would have the power to indemnify such person against such liability under the Act. The Board also may, but is not required to, buy and maintain key man life insurance for any person who is or was a Director, officer, employee or agent of the Company, which may include any such insurance requested or required by and/or payable to a lender who provides financing to the Company. Any such life insurance obtained may be used by the Company to fund the purchase of a Member's Units by the Company in the event of the death of a Member.

10. Transfer of Units.

10.1. Permitted Assignments. A Member may only sell, assign, hypothecate, encumber or otherwise transfer any part (but not less than the lesser of (i) one Unit or (ii) the Member's entire interest in the Company) or all of his or her interest in the Company if the following requirements are satisfied:

10.1.1. The Board consents in writing to the transfer;

10.1.2. No Member shall transfer, assign or convey or offer to transfer, assign or convey all or any portion of a Unit to any Person who does not possess the financial and other qualifications required of all Persons who become Members;

10.1.3. No Member shall have the right to transfer any Unit to any minor or to any person who, for any reason, lacks the capacity to contract for himself or herself under applicable law. Such limitations shall not, however, restrict the right of any Member to transfer any one or more Units to a custodian or a trustee for a minor or other Person who lacks such contractual capacity;

10.1.4. The Board, with advice of counsel, must determine that such transfer will not jeopardize the applicability of the exemptions from the registration requirements under the Securities Act, and registration or qualification under state securities laws relied upon by the

Company in offering and selling the Units or otherwise violate any federal or state securities laws;

10.1.5.　　The Board, with advice of counsel, must determine that, despite such transfer, Units will not be deemed traded on an established securities market or "readily tradable on a secondary market (or the substantial equivalent thereof)" under the provisions applicable to publicly traded partnership status;

10.1.6.　　Any such transfer shall be set forth in a written instrument of assignment, the terms of which are not in contravention of any of the provisions of this Agreement, and which have been duly executed by the assignor of such Units and accepted by the Board in writing. Upon such acceptance by the Board, such an assignee shall take subject to all terms of this Agreement and shall become an Economic Interest Owner;

10.1.7.　　The Board may require that a transfer fee be paid by the transferring Member in such amount as may be determined by the Board to cover all reasonable expenses, including attorneys' fees, connected with such assignment; and

10.1.8.　　The transfer will not result in qualified benefit plans owning twenty-five percent (25%) or more of the Units.

10.2. Substituted Member.

10.2.1.　　Conditions to be Satisfied. No Economic Interest Owner shall have the right to become a Substituted Member unless the Board shall consent thereto in accordance with Section 10.2.2 and all of the following conditions are satisfied:

(a)　　A duly executed and acknowledged written instrument of assignment shall have been filed with the Company, which instrument shall specify the number of Units being assigned and set forth the intention of the assignor that the assignee succeed to the assignor's interest as a Substituted Member in his or her place;

(b)　　The assignor and assignee shall have executed, acknowledged and delivered such other instruments as the Board may deem necessary or desirable to effect such substitution, which may include an opinion of counsel regarding the effect and legality of any such proposed transfer, and which shall include: (i) the written acceptance and adoption by the assignee of the provisions of this Agreement, and (ii) the execution, acknowledgement and delivery to the Board of a special power of attorney, the form and content of which are more fully described herein; and

(c)　　To the extent required by the Board, a transfer fee sufficient to cover all reasonable expenses connected with such substitution shall have been paid to the Company.

10.2.2.　　Consent of Board. The consent of the Board shall be required to admit an Economic Interest Owner as a Substituted Member. The granting or withholding of such consent shall be within the sole and absolute discretion of the Board. The Board may elect whether or not to treat an assignee who has not become a Substituted Member as a Substituted

Member in the place of his or her assignor should the Board deem, in its sole and absolute discretion, that such treatment is in the best interest of the Company.

10.2.3. <u>Consent of Members</u>. By executing or adopting this Agreement, each Member hereby consents to the admission of additional or Substituted Members, and to any Economic Interest Owner becoming a Substituted Member upon consent of the Board and in compliance with this Agreement.

10.3. <u>Rights of Economic Interest Owner</u>. An Economic Interest Owner shall be entitled to receive Distributions from the Company attributable to the interest acquired by reason of such assignment from and after the effective date of the assignment, provided the Economic Interest Owner was such on the record date for such Distributions; provided, however, that notwithstanding anything herein to the contrary, the Company shall be entitled to treat the assignor of such interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of Net Income and Net Loss or Distributions, or for the transmittal of reports or accounting until the written instrument of assignment has been received by the Company and recorded on its books. The effective date of such assignment shall be the date on which all of the requirements of this Section 10 have been complied with, subject to Section 4.7.

10.4. <u>Right to Inspect Books</u>. Economic Interest Owners shall have no right to inspect the Company's books and records, to vote on Company matters, or to exercise any other right or privilege as Members, until they are admitted to the Company as Substituted Members except as provided in the Act.

10.5. <u>Assignment of 50% or More of Units</u>. No assignment of any Units may be made if the Units to be assigned, when added to the total of all other Units assigned within the thirteen (13) immediately preceding months, would, in the opinion of counsel for the Board, result in the termination of the Company under the Code.

10.6. <u>Transfer Subject to Law</u>. No assignment, sale, transfer, exchange or other disposition of any Units may be made except in compliance with applicable governmental laws and regulations, including state and federal securities laws.

10.7. <u>Termination of Membership Interest</u>. Upon the transfer of a Unit in violation of this Agreement, the Membership Interest of a Member shall be converted into an Economic Interest.

10.8. <u>Involuntary Dispositions</u>.

10.8.1. In the event any application to a competent court by any judgment creditor of a Member to charge the Unit ownership of the debtor Member with payment of the unsatisfied amount of such judgment debt, or for appointment of a receiver for the debtor Member's Distributions, or in the event of any other form of legal proceedings or process by which the Unit ownership of any Member may be sold, either voluntarily or involuntarily, including, without limitation thereto, the filing of any petition by or against any Member under any federal or state law pertaining to bankruptcy or insolvency, the other Members shall have the right (unless said proceeding is discharged without prejudice) within ninety (90) days) to purchase the Units of such Member. The other Members shall have fifteen (15) days after receipt

of notice of any such occurrence within which to give written notice to the selling Member of their election to purchase those Units. In the event more than one Member gives notice of its intent to elect to purchase the Units of the selling Member, such electing Members shall be entitled to purchase the Units on a pro rata basis.

10.8.2. The purchase price to be paid for any Units purchased pursuant to the above Section 10.8.1 shall be the selling Member's Adjusted Capital Investment on the date of the institution of the proceedings giving rise to the transfer. Any amounts owed by the selling Member to the Company, including the Company's expenses incurred in connection with said purchase, shall be deducted from the purchase price.

11.    Books, Records, Accounting and Reports.

11.1. Records, Audits and Reports. The Company shall maintain at its principal office the Company's records and accounts of all operations and expenditures of the Company including the following:

11.1.1. A current list in alphabetical order of the full name and last known business or resident address of each Unit Holder and Director, together with the capital contribution and the share in income and losses of each Unit Holder;

11.1.2. A copy of the Certificate and all amendments thereto, together with any powers of attorney pursuant to which the Certificate or any amendments thereto were executed;

11.1.3. Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

11.1.4. Copies of this Agreement and any amendments thereto, together with any powers of attorney pursuant to which this Agreement or any amendments thereto were executed;

11.1.5. Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

11.1.6. The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

11.2. Delivery to Unit Holders and Inspection.

11.2.1. Each Member, or its representative designated in writing, has the right, upon reasonable written request for purposes related to the interest of that person as a Member, which purposes are set forth in the written request, to receive from the Company:

(a)    True and full information regarding the status of the business and financial condition of the Company;

(b)    Promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year;

(c)    A current list of the name and last known business, residence or mailing address of each Member and Director;

(d)    A copy of this Agreement and the Certificate and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which this Agreement and any certificate and all amendments thereto have been executed; and

(e)    True and full information regarding the amount of cash and description and statement of the agreed value of any property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member.

11.2.2.    Each Economic Interest Owner, or its representative designated in writing, has the right, upon reasonable written request for purposes related to the interest of that person as an Economic Interest Owner, which purposes are set forth in the written request, to receive from the Company the items set forth in Section 11.2.1(b), (c) and (d).

11.3.    Annual Report.    The Board will cause the Company, at the Company's expense, to prepare an annual report containing a year-end balance sheet, income statement and a statement of changes in financial position.  Copies of such statements shall be distributed to each Member within 120 days after the close of each fiscal year of the Company. Such annual report may or may not be audited, in the Board's sole discretion.

11.4.    Tax Information.    The Board shall cause the Company, at the Company's expense, to prepare and timely file income tax returns for the Company with the appropriate authorities, and shall cause all Company information necessary in the preparation of the Unit Holders' individual income tax returns to be distributed to the Unit Holders not later than ninety (90) days after the end of the Company's fiscal year.  The Board shall also cause to be distributed a copy of the Company's tax return to a Member, if requested by such Member.

12.    Termination and Dissolution of the Company.

12.1.    Termination of Company.  The Company shall be dissolved, shall terminate and its assets shall be disposed of, and its affairs wound up upon the earliest to occur of the following:

12.1.1.    Upon the happening of any event of dissolution specified in the Certificate;

12.1.2.    The determination by the Board at any time to dissolve and liquidate the Company;

12.1.3.    The determination of the Members, by Majority Vote, to dissolve and liquidate the Company;

12.1.4.    Upon the entry of a decree of judicial dissolution;

12.1.5.    Total liquidation of all Property and provisions for all Company debts and reasonably foreseeable contingent liabilities; or

12.1.6.    Upon the sale of all Company assets and completion of collection of all debts to the Company or the reasonable determination by the Board that all remaining outstanding obligations to the Company are uncollectible or not economically collectible (excluding obligations of the Directors, to which it shall have no such authority).

12.2.    Statement of Dissolution.    As soon as possible following the occurrence of any of the events specified in Section 12.1, the Board who has not wrongfully dissolved the Company or, if none, the Members, shall execute and deliver to the Secretary of State of Colorado for filing a Statement of Dissolution as shall be required by the Act.

12.3.    Liquidation of Assets.    Upon a dissolution and termination of the Company, the Board (or in case there is no Board, the Members or person designated by a Majority Vote) shall take full account of the Company assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair market value thereof, and shall apply and distribute the proceeds therefrom in the following order:

12.3.1.    To the payment of creditors of the Company, other than Members who are creditors, but excluding secured creditors whose obligations will be assumed or otherwise transferred on liquidation of Company assets, and then to the payment of Members who are creditors of the Company;

12.3.2.    To the setting up of any reserves as deemed advisable or as otherwise required by law for any liabilities or obligations of the Company; provided, however, that said reserves shall be deposited with a bank or trust company in escrow with interest for the purpose of disbursing such reserves for the payment of any of the aforementioned contingencies and, at the expiration of a reasonable period, for the purpose of distributing the balance remaining in accordance with the remaining provisions of this Section 12.3 to the Units Holders;

12.3.3.    To the Unit Holders until their Adjusted Capital Investment is reduced to zero;

12.3.4.    To the Unit Holders until each Unit Holder has received the same dollar amount of distributions under this Section 12.3 on a per Unit basis (*i.e.*, until distributions to the Unit Holders have been equalized on a per Unit basis); and

12.3.5.    Thereafter, to the Unit Holders in proportion to their Units.

12.4.    Distributions Upon Dissolution.    Each Member shall look solely to the assets of the Company for all Distributions and the return of its capital contribution, and shall have no recourse therefore (upon dissolution or otherwise) against any Director or any Member.

13.    Special and Limited Power of Attorney.

13.1.    Power of Attorney.    By executing a subscription agreement in connection with the purchase of Units, a written instrument of assignment pursuant to Section 10.2.1, or this

Agreement, each Unit Holder hereby constitutes and appoints, at all times during the term of the Company, the Board as the attorney-in-fact for each Member, with power and authority to act in the name and on behalf of each such Member to execute, acknowledge, and swear to in the execution, acknowledgement and filing of documents that are not inconsistent with the provisions of this Agreement and which may include, by way of illustration but not by limitation, the following:

13.1.1.    This Agreement, as well as any amendments thereto;

13.1.2.    The Certificate, as well as any amendments thereto, or any other instrument or document that may be required under the laws of any state or by any governmental authority;

13.1.3.    Any instrument or document that may be required to effect the continuation of the Company, the admission of Substituted Members, or the dissolution and termination of the Company (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement); and

13.1.4.    Any deed, deed of trust, mortgage, security device, or other instrument of conveyance or encumbrance, with respect to Property.

13.2.    <u>Notice to Members</u>.  The Board shall promptly furnish to a Member a copy of any amendment to this Agreement executed by a member of the Board, on behalf of the Board, pursuant to a power of attorney from the Member.

14.    <u>Death, Bankruptcy, Incapacity, Marital Dissolution of a Member or Termination of Employment of an Employee-Member</u>.

14.1.    <u>Death of a Member</u>.

14.1.1.    The death of a Member shall not terminate the Company.  Upon the death of a Member, the personal representative of the deceased Member shall have all the rights of the Member in the Company to the extent of the deceased Member's interest therein, subject to the terms and conditions of this Agreement, and the estate of the deceased Member shall be liable for all his or her liabilities as a Member, as well as the execution of all documents required to effect the appropriate substitution of the decedent's estate or beneficiary as a Member hereunder.

14.1.2.    The decedent's estate or beneficiary (successor in interest) shall be, at such time as said successor in interest is legally recognized as the owner of such decedent's interest, a full Substituted Member without the necessity of complying with any of the provisions of Section 10, except those provisions contained in Section 10.2.  However, during probate of the decedent's estate and if such Company interest is subject to such probate, then in such event such successor in interest during probate shall be treated as an Economic Interest Owner and not a full Substituted Member until such time as probate closes by evidence satisfactory to the Board.

14.1.3.    If the decedent was an employee of the Company, the Company shall have the option, in its sole discretion, to repurchase the units held by such employee-member at

the Purchase Price noted in Section 14.6, by giving notice to the personal representative or successor to the decedent within ninety (90) days of the decedent's date of death, with a closing to occur within ninety (90) days after the sending of such notice. Payment shall be made as follows: - ten percent (10%) down at the closing followed by 10 annual amortized payments of principal and interest at the Applicable Federal Rate at the time of the closing. Such annual payments shall begin one (1) year after the closing.

14.2. Bankruptcy of a Member.

14.2.1. If a Member should voluntarily file a petition to declare bankruptcy or should voluntarily or involuntarily commit any act of bankruptcy or is adjudged bankrupt or any chapter proceeding under federal or state bankruptcy or insolvency law is instituted on its behalf (in the event of an involuntary petition in bankruptcy against such Member), then during such bankruptcy proceedings, no matter how initiated and until the Member is adjudicated bankrupt, the Member shall not have any other rights herein, including voting rights, other than the right to receive Distributions and allocations, and neither shall the Member's successor in interest during bankruptcy proceedings, no matter how initiated, have any voting or other rights herein. The interest of said Member during such times as above described shall be in the nature of an interest held by an Economic Interest Owner.

14.2.2. It is the intention of this Company and its Members that only the beneficial interest of the bankrupt Member will be vested in said Member or its successor and the consequences of any bankruptcy shall not interfere with the operations of the Company, except as provided herein.

14.2.3. At such time as bankruptcy is legally terminated to the satisfaction of the Board and if the bankrupt Member after bankruptcy still owns the beneficial interest of its Units, then said Member will at said time be vested again with full voting rights. If after bankruptcy the Member's creditors or anyone else is the beneficial owner of the bankrupt Member's interest in this Company, then such successor will not have any voting or other similar powers hereunder, and such successor shall be treated as an Economic Interest Owner hereunder unless and until such successor is approved of as a full Substituted Member pursuant to the terms of this Agreement.

14.2.4. If the bankrupt is an employee of the Company, the Company shall have the option, in its sole discretion to repurchase the units held by such employee-member at the Purchase Price noted in Section 14.6, by giving notice to the trustee in bankruptcy or the employee-member within ninety (90) days of the filing date of the bankruptcy, with a closing to occur within ninety (90) days after the sending of such notice. Payment shall be made as follows: - ten percent (10%) down at the closing followed by 10 annual amortized payments of principal and interest at the Applicable Federal Rate at the time of the closing. Such annual payments shall begin one (1) year after the closing.

14.3. Insanity or Incapacity of a Member.

14.3.1. In the event of the insanity or incapacity (determined by the proper authority or court of law having jurisdiction over such matters) of a Member, the interest of the

insane or incapacitated Member shall, from the date such is determined or decreed, not carry or be entitled to any voting rights or similar powers hereunder, even if such Member has a legal guardian or conservator or any other legal representative appointed over the Member's affairs. At such time as that Member is determined to be legally sane or capable by the proper authority or court of law having jurisdiction over such matters, irrespective of the place of residency, then the voting rights and similar powers of that Member's interest shall again be fully vested in such Member. In the interim the interest of the Member shall be in the nature of an interest held by an Economic Interest Owner.

14.3.2.     If the insane or incapacitated member is an employee of the Company, the Company shall have the option, in its sole discretion to repurchase the units held by such employee-member at the Purchase Price noted in Section 14.6, by giving notice to the employee-member or his/her guardian or conservator within ninety (90) days of the determination of such insanity or incompetence as note in 14.3.1, with a closing to occur within ninety (90) days after the sending of such notice. Payment shall be made as follows: - ten percent (10%) down at the closing followed by 10 annual amortized payments of principal and interest at the Applicable Federal Rate at the time of the closing. Such annual payments shall begin one (1) year after the closing.

14.4.     Marital Dissolution of a Member.

14.4.1.     If a Member or the spouse of a Member should become involved in legal proceedings for dissolution, separation, or divorce from their spouse, during such proceedings, no matter how or when initiated and until the Unit ownership of this Company, or defined percentages thereof, is confirmed (by the Court with jurisdiction over such ownership) as the separate property of one spouse, said Member shall not have any voting rights herein. Interest of the Member shall be in the nature of an interest held by an Economic Interest Owner.

14.4.2.     It is the intention of this Company and its Members that only the beneficial interest of the involved Member will remain with said Member, and the consequences of such legal proceedings shall not interfere with the operation of this Company.

14.4.3.     At such time as the ownership of the Units is confirmed or decided by the court in proportions or in total, then said party shall be vested again with full voting rights, singly or jointly in whatever proportions determined by said court.

14.4.4.     If the member who has become involved in legal proceedings for dissolution, separation, or divorce from their spouse is an employee of the Company, the Company shall have the option, in its sole discretion to repurchase the units held by such employee-member, which have been ordered by the court to be given to the employee's spouse at the Purchase Price noted in Section 14.6, by giving notice to the employee-member or his/her spouse within ninety (90) days of the receipt of notice by the Company of the court's decision to grant units held by the employee-member to the spouse, with a closing to occur within ninety (90) days after the receipt of such notice. Payment shall be made as follows: - ten percent (10%) down at the closing followed by 10 annual amortized payments of principal and interest at the Applicable Federal Rate at the time of the closing. Such annual payments shall begin one (1) year after the closing.

14.5　In the event that an employee-member of the Company shall leave the employ of the Company, voluntarily or involuntarily within 24 months of the commencement of their employment with the Company the Company shall have the option, in its sole discretion to repurchase the units held by such employee-member, at the Purchase Price noted in Section 14.6, by giving notice to the employee-member within ninety (90) days of such termination of employment, with a closing to occur within ninety (90) days after the receipt of such notice. Payment shall be made as follows: - ten percent (10%) down at the closing followed by 10 annual amortized payments of principal and interest at the Applicable Federal Rate at the time of the closing. Such annual payments shall begin one (1) year after the closing

14.6　The Purchase Price of the units with respect to 14.1.3, 14.2.4, 14.3.2, 14.4.4 and 14.5 shall, for the first twenty-four (24) months after the execution of this Agreement be equal to the net book value of the Company, divided by the number of units outstanding at the date of the event noted in the aforementioned sections, times the number of units, which the Company has an option to re-purchase. At any time after such twenty-four (24) month period, the value of the units shall be based on an appraisal conducted by a qualified appraiser selected by the outside CPA preparing the financial statements or tax returns of the Company and shall take into account minority interest and marketability discounts deemed applicable by such appraiser.

15.　Amendment of Agreement.

15.1.　Admission of Member.　Amendments to this Agreement for the admission of any Member or Substituted Member shall not, if in accordance with the terms of this Agreement, require the consent of any Member.

15.2.　Amendments with Consent of the Members.　In addition to any amendments otherwise authorized herein, this Agreement may be amended by the Board with a Majority Vote of the Units; provided, however, that any amendment that would treat a specific Member less favorably than another Member (in application but not in effect), then such amendment shall require the vote of such adversely affected Member.

15.3.　Amendments without Consent of the Members.　In addition to the Amendments authorized pursuant to Section 4.8 or otherwise authorized herein, the Board may amend this Agreement, and, as necessary, the Certificate, without the consent of any of the Members by special or general power of attorney or otherwise, to:

(a)　Change the name and/or principal place of business of the Company;

(b)　Add to the representations, duties, services or obligations of the Board or surrender any right or power granted to the Board herein (so long as such surrender does not impair the ability of the Board to manage the Company and conduct its business and affairs) for the benefit of the Members;

(c)　Delete or add any provisions of this Agreement required to be so deleted or added for the benefit of the Members by the staff of the Securities and Exchange Commission or by a state "Blue Sky" Commissioner or similar official;

(d)     Minimize the adverse impact of, or comply with, any final regulation of the United States Department of Labor, or other federal agency having jurisdiction, defining "plan assets" for ERISA purposes;

(e)     Reconstitute the Company under the laws of another state if beneficial;

(f)     Appoint a different "tax matters partner;"

(g)     Take such steps as the Board deems advisable to preserve the tax status of the Company as an entity that is not taxable as a corporation for federal income tax purposes;

(h)     Revise the provisions of Section 4 to better ensure that the allocation of Net Income and Net Loss under this Agreement will be respected for federal income tax purposes, provided that any revision based on this subsection shall not reduce Distributions to Members or impose an obligation to restore an Adjusted Capital Account Deficit and shall be consistent, to the extent possible, with the allocations set forth in Section 4 immediately prior to such amendment;

(i)     Make any changes to this Agreement as requested or required by any lender or potential lender that may be required to obtain financing; and

(j)     As long as such action shall not materially and adversely affect the Members, any other amendments similar to the foregoing.

15.4. <u>Execution and Recording of Amendments</u>.  Any amendment to this Agreement shall be executed by a Director as attorney-in-fact for the Members pursuant to the power of attorney contained in Section 13.  After the execution of such amendment, the Board shall also prepare and record or file any certificate or other document which may be required to be recorded or filed with respect to such amendment, either under the Act or under the laws of any other jurisdiction in which the Company holds any Property or otherwise does business.

16.     <u>Miscellaneous</u>.

16.1. <u>Counterparts</u>.  This Agreement may be executed in several counterparts, and all so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart. The exchange of copies of this Agreement and of signature pages by facsimile transmission or other electronic means shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or other electronic means shall be deemed to be their original signatures for all purposes.

16.2. <u>Successors and Assigns</u>.  The terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the respective Members.

16.3. <u>Severability</u>. In the event any sentence or section of this Agreement is declared by a court of competent jurisdiction to be void, such sentence or section shall be deemed severed from the remainder of this Agreement and the balance of this Agreement shall remain in full force and effect.

16.4. <u>Notices</u>. All notices, consents, waivers and other communications required or permitted under this Agreement must be in writing and will be deemed to have been given by a party (a) when delivered by hand; (b) one day after deposit with a nationally recognized overnight courier service; (c) upon first attempted delivery after deposit in the United States mail, if sent by certified mail, return receipt requested, except that notice of any meeting or the furnishing of any financial statement to the Members may be done by regular mail and will be deemed delivered five days after deposit in the United States mail; or (d) when sent by facsimile with confirmation of transmission by the transmitting equipment (a confirming copy of the notice shall also be delivered by the method specified in (b) above), in each case costs prepaid and addressed to the party to be notified at the address indicated for such party on the Company's books if to a Member, or if no such address appears, at the principal executive office of the Company, or to the address of the Company indicated herein if to the Board, or at such other address as such party may designate by ten (10) days advance written notice to the other party or parties.

16.5. <u>Governing Law</u>. The laws of the state of Colorado (without giving effect to its conflicts of laws principles) govern all matters arising out of or relating to this Agreement and all of the transactions it contemplates, including without limitation, its validity, interpretation, construction, performance, and enforcement.

16.6. <u>Captions</u>. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and reference. Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provisions hereof.

16.7. <u>Number and Gender</u>. Whenever required by the context hereof, the singular shall include the plural, and vice versa, and the masculine gender shall include the feminine and neuter genders, and vice versa.

16.8. <u>Additional Documents</u>. Each Member, upon the request of the Chief Executive Officer or other authorized officer of the Company, shall perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement, including, but not limited to, providing acknowledgment before a notary public of any signature made by a Member.

16.9. <u>Disputes and Binding Arbitration</u>. Any dispute or controversy arising under, out of, or in connection with or in relation to this Agreement, or the breach thereof, or any offering of Units or an investment in the Units shall be determined and settled by binding arbitration to be held in the County of Denver, Colorado, in accordance with the then applicable rules of the American Arbitration Association, and judgment entered upon the award rendered may be enforced by appropriate judicial action. The arbitration panel shall consist of one member, which shall be the mediator if mediation has occurred or shall be a person agreed to by each party to the dispute within 30 days following notice by one party that it desires that a matter be

arbitrated. If there was no mediation and the parties are unable within such 30-day period to agree upon an arbitrator, then the panel shall be one arbitrator selected by the Denver office of the American Arbitration Association, which arbitrator shall be experienced in and knowledgeable with respect to the subject matter area of the dispute. The losing party shall bear any fees and expenses of the arbitrator, other tribunal fees and expenses, reasonable attorneys' fees of both parties, any costs of producing witnesses and any other reasonable costs or expenses incurred by such losing party and the prevailing party or such costs shall be allocated by the arbitrator. The arbitration panel shall render a decision within 30 days following the close of presentation by the parties of their cases and any rebuttal. The parties shall agree within 30 days following selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery. No incidental, special, consequential or punitive damages may be awarded against any party.

16.10. <u>Integrated and Binding Agreement</u>. This Agreement contains the entire understanding and agreement among the parties with respect to the subject matter hereof, and there are no other agreements, understandings, representations or warranties among the parties other than those set forth herein, and in any materials constituting "offering materials" and provided in connection with an offering of Units by the Company, as applicable. This Agreement may be amended only as provided in this Agreement.

16.11. <u>Not for Benefit of Creditors</u>. The provisions of this Agreement are intended only for the regulation of relations among Members and between Members and putative Members and the Company. This Agreement is not intended for the benefit of non-Member creditors and no rights are granted to non-Member creditors under this Agreement.

16.12. <u>Legal Representation and Independent Counsel</u>. The law firm of Samuel David Cheris, Esq. has prepared this Agreement on behalf of the Company based on the Company's instructions. Samuel David Cheris, Esq. does not represent any other party to this Agreement. In executing this Agreement, each Director and Member represents that such Director or Member has neither requested nor been given legal advice or counsel by Samuel David Cheris, Esq. or any of its attorneys. Each Director and Member is aware of such Director's or Member's right to obtain separate legal counsel with respect to the negotiation and execution of this Agreement and acknowledges that Samuel David Cheris, Esq. has recommended that each Director and Member retain his or her own counsel for such purpose. Each Director and Member further acknowledges that such Director or Member (i) has read this Agreement and its exhibits and attachments; (ii) has had the opportunity to retain separate counsel in connection with the negotiation and execution of this Agreement; and (iii) has relied on the advice of separate counsel with respect to this Agreement or made the conscious decision not to retain counsel in connection with the negotiation and execution of this Agreement. In addition, each Member consents to the Board hiring counsel for the Company that is also counsel to a Director, an officer, a Member, or any of their respective Affiliates.

16.13. <u>Reconstitution in Another State</u>. If the State of Colorado amends the Act in any manner that precludes the Company, at any time, from obtaining an opinion of tax counsel to the effect that the Company shall be treated as a partnership for federal income tax purposes and not as an association taxable as a corporation, the Board may, in its sole discretion, reconstitute the Company under the laws of another state.

16.14. <u>Title to Company Property</u>.  All Property shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Property in its individual name or right, and each Member's Membership Interest shall be personal property for all purposes.

16.15. <u>Relationship of This Agreement to the Act</u>.  Many of the terms of this Agreement are intended to alter or extend provisions of the Act as they may apply to the Company or the Members.  Any failure of this Agreement to mention or specify the relationship of such terms to provisions of the Act that may affect the scope or application of such terms shall not be construed to mean that any of such terms is not intended to be a limited liability company agreement provision authorized or permitted by the Act or which in whole or in part alters, extends or supplants provisions of the Act as may be allowed thereby.

*[Signatures on following page.]*

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest, authorized representative and/or surviving spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By:_____
Name:_____
Title:_____

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang

Duc in Altum, LLC

By:_____
Name:_____
Title:_____

Houghton Financial Management, LLC

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest, authorized representative and/or surviving spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By:_____
Name:_____
Title:_____

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang                                    4/21/22

Duc in Altum, LLC

By:_____
Name:_____
Title:_____

Houghton Financial Management, LLC

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest, authorized representative and/or surviving spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By:_____
Name:_____
Title:_____

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang

Duc in Altum, LLC

By:_____
Name:_____ LARRY Jaeger
Title:_____President____

Houghton Financial Management, LLC

By:_____
Name:_____
Title:_____

{Z0363288/2 }

- 33 -

Rev A 8-12-21

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest,
authorized representative and/or surviving
spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By:_____
Name:_____
Title:_____

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang

Duc in Altum, LLC

By:_____
Name:_____
Title:_____

Houghton Financial Management, LLC

By:_____
Name:_____
Title:_____

{Z0363288/2 } Rev A 8-12-21

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest, authorized representative and/or surviving spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By:_____
Name:_____
Title:_____

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang

Duc in Altum, LLC

By:_____
Name:_____
Title:_____

Houghton Financial Management, LLC

By:_____
Name:_ TODD HOUGHTON _____
Title:_ Manager _____

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest, authorized representative and/or surviving spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By: _____
Name: _John Schmidt_
Title: _Managing Partner_

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang

Duc in Altum, LLC

By: _____
Name: _____
Title: _____

Houghton Financial Management, LLC

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest, authorized representative and/or surviving spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By:_____
Name:_____
Title:_____

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang

Duc in Altum, LLC

By:_____
Name:_____
Title:_____

Houghton Financial Management, LLC

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the undersigned have set their hands to this Agreement as of August 12, 2021.

MEMBERS:

_____
Nicole Thibault, successor in interest,
authorized representative and/or surviving
spouse to Glenn Thibault

_____
Dr. Norm Thibault

_____
Thane Palmer

Jam Three Points Holdings LLC

By:_____
Name:_____
Title:_____

_____
Larry Gabele

_____
Michael Thompson

_____
Michael Perez

_____
Dave Strang

Duc in Altum, LLC

By:_____
Name:_____
Title:_____

Houghton Financial Management, LLC

By:_____
Name:_____
Title:_____

BOARD OF DIRECTORS (MANAGERS):

_____
Nicole Thibault, Director

_____
Dr. Norm Thibault, Director

_____
Thane Palmer, Director

_____
Todd Houghton, Director

_____
David Anderson, Director

BOARD OF DIRECTORS (MANAGERS):

_____
Nicole Thibault, Director

_____
Dr. Norm Thibault, Director

_____
Thane Palmer, Director

_____
Todd Houghton, Director

_____
David Anderson, Director

**EXHIBIT A**

<u>LIST OF MEMBERS</u>

| <u>Name of Member</u> | <u>Number of Units</u> |
|---|---|
| Nicole Thibault (successor in interest, authorized representative and/or surviving spouse) | 1,437 |
| Norm Thibault | 474 |
| Thane Palmer | 225 |
| Jam Three Points Holdings LLC | 405 |
| Larry Gabele | 81 |
| Michael Thompson | 81 |
| Michael Perez | 42 |
| Dave Strang | 81 |
| Duc in Altum, LLC | 33 |
| Houghton Financial Management, LLC | 141 |
| | |
| TOTAL | 3,000 |

{Z0363288/2 }